**ABERDEEN & ROCKFISH RAILROAD COMPANY et al., Petitioners,**

v.

**The UNITED STATES of America and the Interstate Commerce Commission, Respondents.**

No. 77–1054.

United States Court of Appeals, Fifth Circuit.

Dec. 27, 1977.

Rehearing Denied Jan. 25, 1978.

---

Paul M. Haygood, New Orleans, La., for petitioners and intervenor, Chessie System Lines.

Howard J. Trienens, R. Eden Martin, Richard L. Miller, Lawrence A. Miller, George L. Saunders, Jr., Chicago, Ill., for petitioners.

Carl E. Sanders, John L. Taylor, Jr., Atlanta, Ga., for SEARUC & Southern Governors' Conference.

H. N. Babcock, Cleveland, Ohio, for Chessie System Lines.

Griffin B. Bell, U. S. Atty. Gen., U. S. Dept. of Justice, Peter A. Fitzpatrick, Asst. Gen. Counsel, Mark L. Evans, Kenneth G. Caplan, Attys. ICC, Gen. Counsel, Washington, D. C., for respondents.

Moise W. Dennery, Atty., J. William Vaudry, Jr., New Orleans, La., Walter J. Myskowski, Washington, D. C., Richard H. Stokes, George M. Onken, Jamaica, N. Y., for Long Island Rail Road Co.

Before GOLDBERG, and HILL, Circuit Judges, and WYZANSKI, Senior District Judge.*

* Senior District Judge for the District of Massachusetts, sitting by designation.

WYZANSKI, Senior District Judge:

This case comes before us upon the petition of Southern and Western railroads, invoking our alleged jurisdiction under 28 U.S.C. § 2342 to review and set aside an order dated November 23, 1976, served December 9, 1976, modifying an order dated August 15, 1975, served September 12, 1975, issued by the Interstate Commerce Commission [ICC] in its Docket Ex Parte 299 (Sub. No. 1) *"Increases in Freight Rates and Charges to Offset Retirement Tax Increases—1973."* The ICC Report, setting forth the opinions and findings relevant to the August 15, 1975 order, has been published in 350 I.C.C. 673, 705–718 (1975).

Intervening as petitioners are Southeastern Association of Regulatory Utility Commissioners and Southern Governors' Conference.

Respondents are the United States and the Interstate Commerce Commission. Intervening as respondent is Long Island Rail Road Company [Long Island].

Stated broadly, the dominant issue in this case is whether, under Title II—Interstate Commerce Act Amendments, Act of July 10, 1973, 83 Stat. 162, 166–167, [which was originally codified as 49 U.S.C. § 15a(4), and is so referred to by the ICC, by the parties, and by us, but which the Railroad Revitalization and Regulatory Reform Act of 1976, P.L. 94–210 has re-designated as 49 U.S.C. § 15a (6)], the ICC had authority, and if so whether its report sets forth an adequate basis for exercising its authority, to require the petitioning railroads to incorporate into all tariffs naming the rates applicable to total line-haul freight charges on shipments originating or terminating on the Long Island Rail Road a 12.5 percent surcharge which accrues solely to the Long Island, and which Long Island uses to recoup its increases in Railroad Retirement taxes, imposed by Title I—Railroad Retirement Act Amendments, Act of July 10, 1973, 87 Stat. 162.

We shall address ourselves, first, to a summary description of the 1973 statute which gave rise to the problem, then, to such facts about the Long Island as were disclosed in the administrative proceeding—and are virtually uncontested—next, to the findings and conclusions of the report adhered to by the majority of the Interstate Commerce Commissioners, and thereafter, to the contentions presented to us.

In 1973 Congress by Title I of the Act of July 10, 1973, 87 Stat. 162 increased the rate of contributions by railroads under the Railroad Retirement Act. This affected rates payable on account of railroad employees regardless of whether they themselves were employed in interstate commerce or in purely local activities. See 45 U.S.C. § 228a(b).

With the purpose of permitting the railroads, by pass-through procedures, to recoup the expenses thus incurred, the Congress, in Title II of the same Act of July 10, 1973, 87 Stat. 162, 166–167, in the following words authorized interim rates, provided for in paragraph 4(b) *infra*, and final rate determinations by the ICC, provided for in paragraph 4(c) *infra:*

*Sec.* 201. Section 15a of the Interstate Commerce Act (49 U.S.C. 15a) is amended by adding at the end thereof the following new paragraph:

"(4)(a) The Commission shall by rule, on or before August 1, 1973, establish requirements for petitions for adjustment of interstate rates of common carriers subject to this part based upon increases in expenses of such carriers resulting from any increases in taxes under the Railroad Retirement Tax Act, as amended, occurring on or before January 1, 1975, or as a result of the enactment of the Railroad Retirement Amendments of 1973. Such requirements, established pursuant to section 553 of title 5 of the United States Code (with time for comment limited so as to meet the required date for establishment and subject to future amendment or revocation), shall be designed to facilitate fair and expeditious action on any such petition as required in subparagraph (b) of this paragraph by disclosing such information as the amount needed in rate increases to offset such increases in expenses and the availa-

bility of means other than a rate increase by which the carrier might absorb or offset such increases in expenses.

"(b) Notwithstanding any other provision of law, the Commission shall, within thirty days of the filing of a verified petition in accordance with rules promulgated under subparagraph (a) of this paragraph, by any carrier or group of carriers subject to this part, permit the establishment of increases in the general level of the interstate rates of said carrier or carriers in an amount approximating that needed to offset increases in expenses theretofore experienced or demonstrably certain to occur commencing on or before the effective date of the increased rates, as a result of any increases in taxes under the Railroad Retirement Tax Act, as amended, occurring on or before January 1, 1975, or as a result of the enactment of the Railroad Retirement Amendments of 1973. Such increases in rates may be made effective on not more than thirty nor less than ten days' notice to the public, notwithstanding any outstanding orders of the Commission. To the extent necessary to effectuate their establishment, rates so increased shall be relieved from the provisions of section 4 of this part and may be published in tariff supplements of the kind ordinarily authorized in general increase proceedings.

"(c) The Commission shall within sixty days from the date of establishment of interim rates under paragraph (4)(b) of this section commence hearings for the purpose of making the final rate determination. The Commission shall then proceed to make such final rate determination with the carrier having the burden of proof. In making such determination, the Commission may take into account all factors appropriate to ratemaking generally under part I of this Act and shall determine such final rates under the standards and limitations applicable to ratemaking generally under part I of this Act. If the increases in rates finally authorized by the Commission are less than the increases in rates initially made effec-

tive, the carrier or carriers shall, subject to such tariff provisions as the Commission shall deem sufficient, make such refunds (in the amount by which the initially increased rate collected exceeds the finally authorized increased rate) as may be ordered by the Commission, plus a reasonable rate of interest as determined by the Commission. Nothing contained in this paragraph shall limit or otherwise affect the authority of the Commission to authorize or to permit to become effective any increase in rates other than the increases herein specified."

The ICC in *Ex Parte* No. 298, *Requirements and Procedures Relating to Railroad Rate Adjustment Act of 1973* (49 C.F.R. § 1107) specified the information to be furnished by carriers utilizing the pass-through procedures.

The initial proceeding related to interim rates governed by Paragraph 4(b) above.

August 13, 1973 all railroads except the Long Island filed with the ICC a petition for permission to increase their interim freight rates by 2 percent effective October 1, 1973 and 2.7 percent effective January 1, 1974 to offset their increased retirement taxes. Included was an increase in the "joint rates" which cover the freight carried by two or more railroads participating in a joint haul. The proceeds of such a joint rate are divided in accordance with principles enunciated in *Class Rates Investigation*, 262 ICC 447 (1939), affirmed in *New York v. United States*, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947), whereby there is a uniform rate structure in the North, the South, and the West, east of the Rocky Mountains, and the Northern and the Southern railroads receive the same share of revenue for the same amount of service. That so-called "equal factor" basis of divisions governs unless the ICC specifically finds that a departure is justified by a difference in costs. *Baltimore & Ohio R. Co. v. Aberdeen & Rockfish R. Co.*, 393 U.S. 87, 89 S.Ct. 280, 21 L.Ed.2d 219 (1968).

August 24, 1973 Long Island, being opposed to increases in joint rates which

would have reimbursed the Long Island for only a small fraction of its increases in retirement taxes, filed a separate petition for permission to file a tariff providing for an interim terminal surcharge of 3.5 percent effective October 1, 1973, and 5.5 percent effective January 1, 1974.

The ICC, by Report and Order dated September 13, 1973, allowed the other railroads to increase their interim rates by 1.9 percent effective October 1, 1973, and 2.6 percent effective January 1, 1974, but denied the Long Island's petition for an interim terminal surcharge.

The Long Island sought review in the Eastern District of New York. A three-judge court held that paragraph 4(b) [49 U.S.C. § 15a(4)(b)], governing interim increases did not prohibit a terminal surcharge for purposes of "an interim rate increase," *Long Island R. R. Co. v. United States*, 388 F.Supp. 943, 946 (E.D.N.Y.,1974). The Court observed at p. 947 that "The sole inquiry at the interim stage was to be whether the proposed increase clearly exceeded the amount needed to cover increases in costs," and then the Court noted:

"In holding that the LIRR's proposal of a terminal surcharge was an appropriate method of effecting an interim rate increase under section 15a(4)(b), we express no view with respect to its propriety as a final solution to the problem of recovering increased costs. This is properly the Commission's decision to make in the first instance in the hearings mandated by section 15a(4)(c). The latter provision on its face appears to contemplate the consideration of more factors than are appropriate under the interim measures of section 15a(4)(b)."

December 6, 1974 the ICC entered an order allowing, purely as an interim rate measure, Long Island to increase its terminal surcharge from 5.5 to 12.5 percent, effective December 19, 1974.

September 12, 1974 the ICC served its August 15, 1975 Report and Order addressing itself to the determination of final rates, pursuant to Paragraph 4(c) [49 U.S.C. § 15a(4)(c)].

With respect to railroads other than Long Island, the ICC determined to prescribe an increase of 2.8 percent in all interterritorial joint rates except those in which Long Island participated. So far as concerned joint rates in which Long Island participated, ICC determined to permit an add-on of a 12.5 percent terminal surcharge, as sought by Long Island.

The ICC on November 23, 1976 issued, and on December 9, 1976 served, an order (1) denying petitions for reconsideration of so much of its August 15, 1975 Report and Order as approved Long Island's 12.5 percent terminal surcharge, and (2) further requiring "the railroads . . . to incorporate the 12.5 percent terminal surcharge into all tariffs naming the rates from and to points on the Long Island Rail Road Company on or before September 12, 1977." It is that November 23, 1976 order which the Southern and Western railroads have petitioned us to set aside.

That order rests for its justification upon what is called a "Second Supplemental Report and Order of the Commission," decided August 15, 1975, from which two Commissioners dissented. The report recites the history of the Long Island's *interim* rates before and after *Long Island R. R. v. United States*, 388 F.Supp. 943 (E.D.N.Y., 1974), summarizes the arguments of the parties with respect to the *final* rates, gives a few facts about the Long Island's operations, its railroad retirement taxes, its revenues from the terminal surcharge, and its possible revenues from alternative sources, and distinguishes earlier rulings of the ICC which tend to challenge rather than to support Long Island's terminal surcharge. The report seeks to differentiate this surcharge from changes in joint rates or divisions of them. After this non-Euclidean demonstration of *quod erat demonstrandum*, the report concludes that the ICC approves the Long Island's terminal charge and orders it to "be incorporated by the railroads into all tariffs naming joint rates from and to points on the Long Island Rail Road Company."

Insofar as we, after repeated readings, can understand the report, this is its reasoning.

The ICC is not here determining the appropriate costs or cost level of any particular traffic. This is a proceeding in which the ICC is determining the amount of revenue needed to offset specific increased retirement taxes.

Long Island's status as a carrier predominantly of passengers is unique. In 1972, while its total income was $94.3 million, only about $9.2 million was derived from freight service. In 1974 its total deficit was about $108 million, of which about $14.2 million was assignable to freight service.

For the calendar year 1974 the Long Island paid additional railroad retirement taxes of $6,027,156. If the 12.5 percent terminal charge had been in effect for all of 1974 it would have yielded $5,995,008. For the calendar year 1975, the Long Island estimates that its additional railroad retirement taxes will be $6,253,595, while its 12.5 percent terminal charge will yield $6,066,494. Thus, even though all of the surcharge goes to the Long Island, it is just short of enabling the Long Island to recoup its payments on account of increased railroad retirement taxes.

Other proposed methods of raising rates would have fallen far, far short of enabling Long Island to recoup those taxes. If Long Island had joined the other railroads in the 2.8 percent general freight increase, Long Island, as a result of divisional arrangements, would have received only $269,000 additional, (or about 5 percent of its additional tax bill).

If Long Island had sought recoupment by applying to the ICC for an increase in its divisional share of all line-haul rates to and from points on its lines, the percent payable to Long Island out of such rates [which had been 14 percent before, and became 16 percent after, April 13, 1973 (or about $1,400,000 annually)] would have required an increase of 37.5 percent, —a totally unrealistic proposal.

In considering the Long Island's terminal surcharge the ICC Report discusses, even if esoterically, at least five points which are related to "standards and limitations applicable to ratemaking generally under Part I" of the Interstate Commerce Act:

(1) The surcharge does not cover any service, but is designed to cover expenses caused by the 1973 Railroad Retirement Act Amendments. This raises problems in connection with Rule 10 of Commission's Tariff Circular No. 29 which authorizes carriers to publish tariffs containing rates and charges for terminal services, but does not authorize the publication of charges where no service is performed. Hence if it is to allow the surcharge the Commission will have to give relief from its tariff publishing regulations. But this is not an insurmountable objection.

(2) The surcharge is intended to reimburse Long Island for a single item of expense. It is generally not a sound and orderly ratemaking practice to isolate a single item from other operating expenses. However, this also is not an insurmountable objection.

(3) The surcharge, as made originally by the Long Island in its *interim* rates, was not plainly disclosed to a shipper or user of tariffs. The tariffs naming joint rates from and to points on the Long Island merely disclosed joint rates for a complete line-haul service to and from the named points, and did not show the surcharge. This was contrary to the intendment of Section 6 of the Interstate Commerce Act that a user of tariffs should be able to rely on what the tariffs plainly say. However, this can be cured in connection with final rates by requiring all railroads having joint rates with Long Island to show the terminal charge.

(4) The surcharge is designed to reimburse the Long Island not merely for retirement taxes attributable to employees engaged in interstate freight operations, but also for retirement taxes attributable to employees exclusively engaged in commuter passenger and like local services. Pre-World War I ICC opinions had held that, in general, each

branch of railroad service should contribute its proper share of the cost of operation. But later ICC opinions ruled that that was not an inflexible rule and that if the ICC found in a particular case that the passenger service, inevitably and inescapably, could not bear its costs, then the ICC would allow the passenger deficit to be taken into account in adjustment of freight rates. In the present case, without making any detailed findings as to the policy of the 1973 recoupment statute, the amount of taxes attributable to the commuter service, the economic possibilities of passing the tax to passengers, and other matters relevant to the public interest, the ICC found and concluded that the question of how much of the tax burden should be borne by the freight shippers "is a question of managerial discretion more properly directed in the first instance to the MTA [Metropolitan Transit Authority], which operates the Long Island. . . . We [that is, the ICC] observe in passing that the L.I.R.R. passenger deficit for 1974 is estimated at $108 million. Presumably the revenue from a fare increase would be needed to combat that deficit." Just such managerial discretion had been exercised by the protesting railroads,—for they included in their increased freight rates the increased retirement taxes of their employees engaged in commuter or other passenger service as well as the increased retirement taxes of employees exclusively engaged in interstate freight operations. (5) The surcharge benefits only the Long Island. It is not shared with those who are entitled to a division of the joint rates which the shipper pays. In the ICC's view, "the joint rates and division thereof are unchanged by the surcharge tariff. The surcharge is a separate add-on to the line-haul rates, the yield from which accrues solely to the LIRR." "It is a separate charge in its individual tariff, the revenue from which accrues to the LIRR to offset its increased retirement tax cost. While it affects the total freight charges, it does not change any joint rate."

Having dealt, more or less in the way we have just set forth, with the issues before it, the ICC (in both its order dated August 15, 1975 and in its order dated November 23, 1976) directed that the railroads, including petitioners here, "incorporate the 12.5 percent terminal surcharge into all tariffs naming the rates from and to points on the Long Island Rail Road Company. . . ."

Petitioners launch a broad attack on the November 23, 1976 order. Fundamentally, they challenge the proposition that Title II of the Act of July 10, 1973 authorized the Long Island to recoup through some *economically practical* method of *increasing rates* the entire amount of increased retirement taxes imposed by Title I of that Act. Petitioners read Title II as with one hand giving to Long Island (and, of course, other railroads) the right of full recoupment, and with the other hand denying any recoupment which conflicts with "standards and limitations applicable to ratemaking generally." It is petitioners' position first, that it is contrary to the standards and limitations applicable to ratemaking (a) to allow a permanent terminal surcharge if there is no additional terminal service and (b) to allow a permanent terminal surcharge upon freight to recoup costs nine-tenths of which are due to local commuter passenger service; and second, that even if either allowance could be appropriate, in this matter the ICC has not given a reasoned explanation for departing from prior norms, and has acted arbitrarily.

■ We agree with the petitioners' contention that the ICC did not give a reasoned explanation of its November 23, 1976 order, and, therefore, we find it unnecessary to address ourselves to petitioners' other contentions.

Our starting point is Paragraph 4(c) added by Title II of the Act of July 10, 1973, [originally 49 U.S.C. § 15a(4), now 49 U.S.C. § 15a(6)]. With respect to petitions of carriers for adjustments of interstate rates based upon the expenses of carriers resulting from any increases in taxes under the Railroad Retirement Tax Act, Congress di-

rected the ICC "to make such final rate determination. . . . In making such determination, the Commission . . . shall determine such final rates under the standards and limitations applicable to rate-making generally under Part I" of the Interstate Commerce Act.

We cannot read the ICC's report as a reasoned compliance with that statutory mandate. Indeed the ICC's counsel in arguing this case at our bar admitted that the Commission had not made findings specifically responsive to that mandate.

Illustrative of the deficiencies in the ICC report is its statement that it was a matter for "managerial discretion" for the Long Island to allocate its increased railroad retirement costs, as it saw fit, between interstate freight service rates and intrastate passenger service rates.

As the ICC itself recognized, in ordinary circumstances allocation of costs is not a matter of managerial discretion. Under the standards and limitations applicable to ratemaking generally, each service is usually required to bear its own costs. To justify a departure there must be a reason. Of course, one valid reason might be a supervening statute such as the Act of July 10, 1973.

Unfortunately, the ICC's report does not in specific language explicitly interpret the Act. We are not unmindful that implicitly the ICC report seems to adopt the following construction of the statute: to wit, that when Congress imposed a tax measured by both wages paid to employees engaged in interstate freight services and to employees engaged in intrastate passenger services, and simultaneously authorized the taxpayer to reimburse itself, Congress contemplated that the management would exercise its discretion, subject to final determinations by the ICC under the standards and limitations applicable to ratemaking generally under the Interstate Commerce Act, to allocate reimbursement in accordance with economic feasibility, and in accordance with other rational factors.

If this was indeed the inarticulate major premise of the ICC, then we note that there are missing from the report of the ICC the findings of fact which are necessary to support the ICC in making its final determination to accept an exercise of managerial discretion which provides that *all* the increases in railroad retirement taxes shall be borne exclusively by increases in interstate freight rates. Thus, we do not know from the report whether the ICC found that economically it would not have been feasible to raise passenger rates to recover some or all of the increases in retirement taxes attributable to employees engaged exclusively in passenger service. Nor does the ICC address itself to the question whether if all or part of the new taxes attributable to passenger service are not borne by the freight rates but are left to be borne by the stockholder of the Long Island, that stockholder will allow the Long Island to go out of business as a carrier or as a carrier of interstate freight in order to avoid federal Railroad Retirement Act taxes.

Because of the inherent incompleteness of the ICC's report, which precludes us from having a basis to agree or disagree with its findings, or its interpretations of the statute governing it, and because of the ICC's failure to exercise a reasoned discretion, its order of November 23, 1976 must be set aside as not in compliance either with the Act of July 10, 1973 or with fundamental principles of due process in administrative proceedings. The Fifth Amendment to the United States Constitution requires that when it issues an order, an administrative agency must make findings and state conclusions which are susceptible of understanding by a court of the United States which is called upon to review that order. Cf. *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 392, 444 F.2d 841, 850 (1970). See *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The reviewing court must have in the record before it a reasoned analysis by the administrative agency based on its adequate findings supported by substantial evidence, and must have at least, by clear

implication, the agency's construction of the statute it is applying, so that the court may be aided in its own construction of that law.

■ We have another ground for setting aside the December 9, 1976 order of the ICC. The Supreme Court, affirming a three-judge court in the Eastern District of Louisiana has made it clear that a departure from the equal-factor basis of divisions of joint rates can be allowed only on the basis of specific findings. *Aberdeen & Rockfish R. Co. v. United States*, 270 F.Supp. 695 (E.D.La., 1967), affirmed *Baltimore & Ohio R. Co. v. Aberdeen & Rockfish R. Co.*, 393 U.S. 87, 89 S.Ct. 280, 21 L.Ed.2d 219 (1968). In the case at bar such findings were not made by the ICC because it reasoned that the Long Island's terminal surcharge was an "add-on" and not a modification of the joint rates. We reject this reasoning as being totally unrealistic.

We regard the present case as involving in economic terms a change in the joint rates and divisions thereof. It could not be doubted that if the Long Island added a terminal surcharge avowedly to increase its profits or to cover wage increases for all its employees, and the ICC ordered the other railroads to collect from shippers such amounts as well as joint rates this would constitute an undermining of the principle of both joint rates and equal division of joint rates. We see no difference when the add-on is to recoup tax payments. In all such cases there must be justifying findings for disturbing the rate structure. Of course, an adequate justification may or may not be in the recoupment purpose of the Act of July 10, 1973. As to that point we have already observed that the ICC has not yet appropriately spoken, and so we need not express our opinion.

Inasmuch as petitioners seek to set aside the ICC's order on the ground that it disturbs the rate structure contrary to the principle of division of joint rates the petitioners are correct in maintaining that this court has jurisdiction of this case under 28 U.S.C. § 2342. *Baltimore & Ohio R. v. Aberdeen & Rockfish R. Co., supra.*

■ There remains the question as to how shippers should be charged during the period that this matter is still under consideration by the ICC, to which we must remand this case for further proceedings not inconsistent with our opinion. It seems to us equitable to restore the interim rates pending a determination of the final rates, but to direct that the Long Island keep in a separate trust fund, subject to ultimate determination by the ICC, all sums hereafter received as a consequence of the 12.5 percent interim terminal surcharge.

*The Interstate Commerce Commission order of November 23, 1976 is set aside. Case remanded to the Interstate Commerce Commission for further proceedings in conformity with this opinion. Pending determination of final rates by the Interstate Commerce Commission in this matter, the railroads which were subject to the order here set aside are required to incorporate the 12.5 percent terminal surcharge, as an interim charge, into all tariffs naming the rates from and to points on the Long Island Rail Road Company, and the said Long Island Rail Road Company is required to keep in a separate trust fund the proceeds of the said interim 12.5 percent terminal surcharge subject to further just and equitable orders of the Interstate Commerce Commission.*

REMANDED.