# LONG ISLAND RAIL ROAD CO. *v.* ABERDEEN & ROCKFISH RAILROAD CO. ET AL.

No. 77–1515.   Decided October 16, 1978

PER CURIAM.

Petitioner, the Long Island Rail Road Co., seeks a writ of certiorari to review the judgment of the United States Court of Appeals for the Fifth Circuit setting aside an order of the Interstate Commerce Commission. That judgment directed that proceeds collected by petitioner pursuant to an interim terminal surcharge be held in a separate trust fund pending determination of final rates by the Commission on remand. We stayed the trust fund portion of the court's order on March 6, 1978, and we now grant the petition for certiorari, limited to Question 1 presented by petitioner,[1] and reverse the judgment of the Court of Appeals insofar as it impresses a trust on the proceeds from the interim terminal surcharge.

The Railroad Retirement Amendments of 1973 imposed increased taxes on railroads in order to fund additional retirement benefits for railroad employees. 87 Stat. 162. Coupled with that action, Congress amended § 15a of the Interstate Commerce Act to permit railroads to offset the increased tax liability imposed by the Amendments by means of increases in general rate levels. § 201 (4), 87 Stat. 166, 49 U. S. C. § 15a (6). Section 15a (6)(a) authorizes the Commission promptly to establish requirements for petitions for adjustment of interstate rates of common carriers based on increases in railroad retirement taxes. Such procedures are to be designed to "facilitate fair and expeditious action on any such petition." Section 15a (6)(b) directs the Commission to permit interim increases in the general level of interstate rates within 30 days of the filing of a proper petition, "[n]otwithstanding any other provision of law." The Commission can withhold its permission only if it finds that the requested increase is not "in an amount approximating that needed to offset

_____

[1] "Did the Court of Appeals thwart the purpose of the Railroad Retirement Amendments and frustrate the final judgment of a three-judge court when it deprived the LIRR of the immediate use of its interim terminal surcharge?" Pet. for Cert. 2.

increases in expenses" resulting from the Amendments. Finally, § 15a (6)(c) requires the Commission to commence hearings for the purpose of making final rate determinations within 60 days of the establishment of the interim rates. Such final rates are to be determined in accordance with the "standards and limitations applicable to ratemaking generally." If the final increases in rates are less than the interim increases, refunds must be made by the carrier, subject to such tariff provisions as the Commission deems sufficient.

Since the issue on which we grant certiorari does not relate directly to the rate increase proceedings, the briefest description of them will suffice. All railroads other than petitioner sought permission from the Commission to increase their rates in order to offset the increased taxes imposed by the Amendments. Petitioner, because of its unique revenue structure, sought permission to impose a surcharge for the use of its terminal facilities for the same purpose. The Commission allowed the railroads other than petitioner to increase their interim rates, but denied petitioner's request for an interim terminal surcharge. *Increases in Freight Rates and Charges—1973,* 346 I. C. C. 305 (1973). Petitioner sought review of the denial of its request by the Commission in a three-judge District Court, and that court set aside the relevant portions of the Commission's order and enjoined the Commission from refusing petitioner's terminal surcharge as an interim rate increase under § 15a (6)(b). *Long Island R. Co.* v. *United States,* 388 F. Supp. 943 (EDNY 1974).

No appeal was taken from this judgment, and the Commission subsequently allowed petitioner to impose an interim terminal surcharge in the amount of 12.5%. Thereafter the Commission issued a report and order which approved petitioner's request for a permanent 12.5% terminal surcharge, and required all railroads to incorporate that surcharge into their tariffs to and from points on petitioner's lines. *Increases in Freight Rates and Charges—1973,* 350 I. C. C. 673 (1973).

4

Respondent railroads petitioned the Fifth Circuit to set aside the Commission's order. The Court of Appeals, for reasons which do not concern us here, set aside the order of the Commission allowing petitioner to impose the terminal surcharge and remanded for further proceedings to determine final rates. *Aberdeen & Rockfish R. Co.* v. *United States,* 565 F. 2d 327, 333–335 (1977). Then, stating that "[i]t seems to us equitable," the court *sua sponte* "restore[d]" the 12.5% interim terminal surcharge that petitioner had been collecting prior to the Commission's final order, but directed that the proceeds be kept "in a separate trust fund . . . subject to further just and equitable orders of the Interstate Commerce Commission." *Id.,* at 335.

We agree with petitioner and the United States that the Court of Appeals' direction to hold proceeds from the interim terminal surcharge in a separate trust fund pending determination of final rates by the Commission is contrary both to the earlier holding of the three-judge court and to Congress' intent in adopting the Amendments. The interim terminal surcharge approved by the three-judge court clearly was meant to remain in effect until a permanent rate was approved by the Commission. See *Long Island R. Co.* v. *United States, supra,* at 947. Because of the Court of Appeals' decision setting aside the Commission's order, there has as yet been no determination of final rates by the Commission. The Court of Appeals' order explicitly recognizes as much. *Aberdeen & Rockfish R. Co.* v. *United States, supra,* at 334. We also agree that petitioner could have continued to collect the interim terminal surcharge whether or not the Court of Appeals had explicitly authorized it to do so. Thus, far from maintaining the relative positions of the parties pending final order of the Commission, normally considered the "status quo," the Court of Appeals' imposition of the trust fund requirement significantly altered those positions.

Such an alteration is at odds with the purpose of § 15a (6)(b). The entire thrust of § 15a (6)(b) is to provide an expeditious method of allowing higher rates in order to minimize the effect that increased railroad retirement taxes would have on the railroads' financial condition. At the time of the adoption of the Amendments, Congress was acutely aware of the deteriorating financial condition of the Nation's railroads and the drain which the increased tax liabilities would have on their already dwindling resources. S. Rep. No. 93–221, pp. 2–4 (1973). Congress also recognized that the Commission's normal ratemaking processes would not be responsive to the railroads' needs to recover immediately their increased retirement benefit contributions.[2] The delays experienced in approving the final rates have shown the legitimacy of Congress' concerns.

Section 15a (6)(b) was enacted to ensure that the much-needed funds would get to the railroads as soon as possible: once the interim rates were filed, they could not be suspended until final rate determinations by the Commission. While the Commission normally has the power under § 15 (7) of the Interstate Commerce Act to suspend rates for a period not to exceed seven months, Congress deprived the Commission of even that limited authority in § 15a (6)(b), which begins with the words: "Notwithstanding any other provision of law." The Conference Report on the Amendments to the Interstate Commerce Act states:

"The Commission could withhold permission to file tariffs if it found that the proposed increase clearly exceeded the amount needed to cover the increases in costs, but other-

[2] S. Rep. No. 93–221, p. 3 (1973); H. R. Rep. No. 93–204, pp. 7–8 (1973). The agreement between representatives of railroad labor and management to support increases in railroad retirement taxes conditioned such support on the simultaneous passage of legislation to modify the Commission's existing ratemaking procedures to permit prompt rate increases. S. Rep. No. 93–221, pp. 2, 7 (App. A).

wise *once the tariffs were filed the Commission would have no authority to suspend them pending final determination.*" Joint Explanatory Statement of the Committee of the Conference, H. R. Rep. No. 93–319, p. 12 (1973) (emphasis added).

By impressing the trust on proceeds from these interim charges made by petitioner, the Court of Appeals has exercised authority which Congress clearly did not wish to repose even in the Commission. We have held that where Congress has vested the Commission with authority to suspend rates pending final determination of their lawfulness, that power may not be exercised by a court. *Arrow Transp. Co.* v. *Southern R. Co.,* 372 U. S. 658 (1963); see *Atchison, T. & S. F. R. Co.* v. *Wichita Bd. of Trade,* 412 U. S. 800, 820 (1973) (plurality opinion); *id.,* at 828–829 (WHITE, J., concurring in part and dissenting in part); *United States* v. *SCRAP,* 412 U. S. 669, 691 (1973). We think it follows *a fortiori* from these decisions that where Congress has *denied* authority to the Commission to suspend interim rates, as it has here, a reviewing court may not exercise such power, absent a declaration of unlawfulness by the Commission. See *Arrow Transp. Co.* v. *Southern R. Co., supra,* at 667 n. 14; *Board of R. Comm'rs* v. *Great Northern R. Co.,* 281 U. S. 412, 429–430 (1930). Congress provided a refund mechanism in § 15a (6)(c) in the event that the final rates approved by the Commission are less than the interim rates. Congress undoubtedly was satisfied that this procedure was adequate to protect the interests of the parties affected by the terminal surcharge, and respondent railroads have advanced no reasons for concluding otherwise.

In *Atchison, T. & S. F. R. Co.* v. *Wichita Bd. of Trade, supra,* the plurality recognized a limited power in a reviewing court to suspend rates pending review of a final order of the Commission. See *Scripps-Howard Radio, Inc.* v. *FCC,* 316 U. S. 4 (1942). That conclusion was based on the fact that there was no "provision in the relevant statutes

depiiving federal courts of their general equitable power to preserve the status quo to avoid irreparable harm pending review." *Atchison, T. & S. F. R. Co.* v. *Wichita Bd. of Trade, supra,* at 820. The plurality also noted that subsequent legislation might "affect the relation between court and agency and so the propriety of injunctive relief." 412 U. S., at 823 n. 16. In the limited context of interim rate increases under § 15a (6)(b), we think the Amendments are "subsequent legislation" that evidences a clear purpose to oust any equitable power that a reviewing court might otherwise possess to disturb those interim rates pending determination of final rates by the Commission. See *Arrow Transp. Co.* v. *Southern R. Co., supra,* at 671 n. 22.

The petition for certiorari accordingly is granted, limited to the question set forth in footnote 1, *supra.* The judgment of the Court of Appeals is reversed insofar as it requires petitioner to keep the proceeds collected from its interim terminal surcharge in a separate trust, and the case is remanded for proceedings consistent with this opinion.

*So ordered.*