830 F.2d 74
 BUSBOOM GRAIN CO., INC., Fisher Farmers Grain & Coal Co.,
and Patrick W. Simmons, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION, United States of America,
and CSX Transportation, Inc., Respondents.
 No. 87-2228.
 United States Court of Appeals,
Seventh Circuit.
 Submitted Sept. 2, 1987.
Decided Sept. 2, 1987.
Opinion Issued Oct. 2, 1987.
 
 Thomas F. McFarland, Jr., Belnap, Spencer, McFarland, Emrich & Herman, Chicago, Ill., Gordon P. MacDougall, Washington, D.C., for petitioners.
 Dennis J. Starks, Office of Gen. Counsel, I.C.C., John J. Powers, III, U.S. Dept. of Justice, Washington, D.C., for respondents.
 Before CUMMINGS, FLAUM, and EASTERBROOK, Circuit Judges.
 EASTERBROOK, Circuit Judge.
 
 
 1
 The Interstate Commerce Commission granted the application of the Chessie System (CSX Transportation) to abandon service on 14 miles of rail line between Henning and Brothers, Illinois, effective September 3, 1987. The ICC found that it would cost Chessie about $36,000 in repairs to keep the line going for another year, and that Chessie was incurring about $32,000 every year in opportunity costs to hold the line in service. (Opportunity costs are the revenues foregone by committing the line to rail service rather than, say, selling the land under the track and investing the money received.) Chessie believes that in the longer term it would cost $330,000 to repair several bridges. Against this Chessie received less than $3,000 per year in net cash flows ("profit", if one disregards opportunity costs). The Commission believed that abandonment would not seriously injure the line's only two customers, who had access to transportation from other railroads and from truck lines.
 
 
 2
 The customers asked for a stay pending judicial review, contending that the ICC did not properly consider the injury they would suffer as a result of the abandonment and that Chessie's application contained defective calculations of the costs of depreciation and rate of return on its freight cars. Chessie, pointing out that it would need to make an immediate outlay to keep the line in service, opposed the application but offered to preserve the track so that it could restore service if the ICC's order should be reversed. The shippers responded that this offer is empty because: (a) Chessie's easements would lapse, so that it could not restore service, and (b) once the carrier abandons service, the ICC may not order it restored. The shippers conclude that it is now or never for them. After considering these arguments we denied the application for a stay. This opinion records our rationale.
 
 
 3
 A strong presumption of regularity supports any order of an administrative agency; a stay pending judicial review is a rare event and depends on a demonstration that the administrative process has misfired. See Coleman v. PACCAR, Inc., 424 U.S. 1301, 96 S.Ct. 845, 47 L.Ed.2d 67 (1976) (Rehnquist, Circuit Justice). If the balance of harms is lopsided, the showing may be lower, just as the strength of the showing on the merits needed to obtain a preliminary injunction varies with the costs of error. When the costs of an erroneous grant of the application are low, and the costs of an erroneous denial high, it does not take a powerful showing on the merits to obtain interim relief. See Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc., 784 F.2d 1325, 1333 (7th Cir.1986); Lawson Products, Inc. v. Avnet, Inc., 782 F.2d 1429, 1433-34 (7th Cir.1986); American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589, 593-94 (7th Cir.1986). Although these cases deal with preliminary injunctions, the same considerations should inform the disposition of applications for stays of administrative decisions. And we must take into account Congress' decision to expedite the abandonment process. Illinois v. ICC, 709 F.2d 1186, 1193 (7th Cir.1983). Ready availability of stays would lock the railroads into losing propositions for periods beyond those provided by the Staggers Act.
 
 
 4
 The shippers have not made a powerful showing of probable administrative error. They maintain, however, that the costs of error are lopsided because, if we permit the ICC's order to take effect, it cannot be undone. The shippers' first contention--that Chessie depends on trackage easements that will lapse when it abandons service--seems to require study of all of Chessie's easements in light of the property law of Illinois. The inquiry is unnecessary, however, given Chessie's promise to resume service if the ICC's order should be reversed. Chessie may negotiate with the owners of the fee interests to protect its right to run trains over their land. Chessie believes that its easements will not expire. Chessie will bear any cost of a mistake in this prediction.
 
 
 5
 The shippers' second contention--that once Chessie ceases service it may not be ordered to resume--requires greater attention. Surprisingly, so far as we can determine no court has addressed this wholly legal question. The Commission does not know of a decision on the point. The shippers rely on Hayfield Northern R.R. v. Chicago & N.W. Transportation Co., 467 U.S. 622, 633-34, 104 S.Ct. 2610, 2617, 81 L.Ed.2d 527 (1984), for the proposition that once the carrier abandons service, the ICC loses jurisdiction. In Hayfield that meant that the state could condemn the line to operate its own railroad. The shippers infer from Hayfield and other cases, holding that the Commission may not compel a railroad to restore service formerly abandoned, that in the absence of a stay this case is effectively over.
 
 
 6
 Hayfield and related cases all assumed, however, that the line had been abandoned lawfully. Once the railroad has been permitted to leave the business as a common carrier over a particular line, it may not be compelled to resume the business any more than a stranger could be dragooned to start service on the line. Until the abandonment process is lawfully completed, the railroad's obligation as a common carrier continues. If the Commission's Secretary forged the Commissioners' signatures to a document authorizing abandonment, the railroad's cessation of service would not prevent the Commission from vacating the order and completing the regular administrative process. So with judicial review. When someone files a petition for judicial review, the legal effect of the order permitting the abandonment depends on the court's decision, even though it may apply in the interim unless the court issues a stay. If the court holds that the ICC's order was not in accordance with law, then the permission to abandon contained in that order vanishes, and the original obligation to offer service remains in force. A judgment setting aside the ICC's decision restores the status quo ante, cf. Long Island R.R. v. Aberdeen & Rockfish R.R., 439 U.S. 1, 4, 99 S.Ct. 46, 47, 58 L.Ed.2d 1 (1978), which means that the railroad must offer service or persuade the ICC to authorize abandonment a second time after complying with all procedural and substantive rules. We therefore conclude that a stay is not essential to the shippers' opportunity to obtain relief.
 
 
 7
 One final note. The shippers insist that a stay would not harm the Chessie, because $33,000 (the likely cost to Chessie of a year's delay pending judicial review) is tiny compared with the profits of the Chessie System. True enough; a tiny line of a big railroad has a correspondingly small relative loss. It is possible to make any number look small by comparing it with a much larger number. The right question deals with absolute dollars or, in some cases, rates of return on investment. See Eagle Foundation, Inc. v. Dole, 813 F.2d 798, 808 (7th Cir.1987). The Chessie need not subsidize service between Henning and Brothers by using revenues earned on shipments from Chicago to Baltimore. Illinois v. ICC, 722 F.2d 1341, 1347 (7th Cir.1983). That other lines of track are profitable does not imply that this stretch must be operated.
 
 
 8
 The application for a stay pending review is denied.