590 F.2d 937
 191 U.S.App.D.C. 235
 CONSOLIDATED RAIL CORPORATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Cincinnati, New Orleans & Texas Pacific Railway Co., et al.,
Intervenors.
 No. 77-1125.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 24, 1978.
Decided June 27, 1978.
 
 Richard J. Murphy, Philadelphia, Pa., a member of the bar of the Commonwealth of Pennsylvania, by special leave of this Court, pro hoc vice, with whom John A. Daily, Philadelphia, Pa., was on the brief, for petitioner.
 Kenneth G. Caplan, Atty., I.C.C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, I.C.C., Charles H. White, Jr., Associate Gen. Counsel, I.C.C., and Daniel J. Conway, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondent. Also Peter A. Fitzpatrick, Atty., I.C.C., Lloyd John Osborn and Robert B. Nicholson, Atty., Dept. of Justice, Washington, D. C., entered appearances, for respondent.
 R. Eden Martin, Chicago, Ill., with whom Richard J. Flynn and Lee A. Monroe, Washington, D. C., were on the brief, for intervenor.
 Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.
 Opinion for the Court filed by McGOWAN, Circuit Judge.
 McGOWAN, Circuit Judge:
 
 
 1
 Petitioner Conrail challenges a ruling by the Interstate Commerce Commission, 353 I.C.C. 165 (1976), that it is bound by a previous order of the Commission[1] entered against several bankrupt northeastern railroads prior to Conrail's assumption, on April 1, 1976, of the rail operations and properties of those companies. Petitioner's essential argument is that it is not bound by prior Commission route, rate, or division orders entered against the bankrupt railroads because it was not a party to the proceedings in which such orders were issued and thus was not afforded a hearing on their lawfulness as required under Interstate Commerce Act § 15(6)(a) (hearing on division orders) and § 15(8)(a) (hearing on route and rate orders), 49 U.S.C. §§ 15(6)(a), 15(8)(a) (Supp. VI 1976). Conrail does not deny that it is subject to ICC regulation and is therefore bound by all lawful Commission orders entered against it as a legal entity, but contends that it is subject to prior route, rate, and division orders entered against the bankrupt railroads only to the extent it has voluntarily decided to adopt such orders.
 
 
 2
 Prior to its assumption of the rail operations of the bankrupt railroads, Conrail did file with the Commission a "voluntary adoption" of those route, rate, and division orders applicable on April 1, 1976, the date it would commence operations. However, the order at issue in this case, which prescribes joint divisions on borderpoint-north traffic, embodied a final Commission decision issued prior to April 1, 1976 but which had not yet become effective on that date, and therefore, according to Conrail, was not within the terms of Conrail's adoption of the divisions applicable on that date. Because Conrail considers itself bound only by those prior Commission orders that it has voluntarily decided to adopt, and it has not adopted the divisions order at issue here, it petitions this court to order the Commission to afford it a full hearing on the merits of the order, allowing it in the meantime to operate under the divisions that were in effect on April 1, 1976.
 
 
 3
 Although this so-called voluntary adoption has operated to limit the extent of Conrail's noncompliance with final Commission orders to those orders which, although final, had not yet become effective as of April 1, 1976, this does not alter the fundamental issue before both the Commission and this court: whether Conrail is bound by final Commission orders entered in adjudicatory proceedings against the bankrupt railroads whose properties and operations it has assumed. The Commission concluded that Conrail is bound by such orders, including the divisions order specifically contested in this case. We agree with the Commission that implicit in the legislation creating Conrail is the requirement that Conrail operate subject to the orders, prospective and otherwise, applicable to the railroads whose operations and properties it has taken over.
 
 
 4
 * A division is a railroad's share of the joint rates charged traffic which moves on the lines of two or more railroads. In the absence of agreement by the participating railroads, division formulas are prescribed by the Interstate Commerce Commission pursuant to § 15(6) of the Interstate Commerce Act.[2]
 
 
 5
 The divisions to which Conrail contends it is not subject relate to freight traffic moving north from a segment of the border between Southern territory and Northern (or "Official") territory. The procedural history of the Commission's efforts to set these divisions is long and complex, and we shall mention only the salient highlights of these efforts. The Commission in 1953 prescribed an "equal-factor basis" division formula for traffic moving between Southern and Northern territories.[3] This formula generally resulted in greater revenues for the southern railroads, and lesser revenues for the northern railroads, than had been the case under the prior formula. In 1962, the southern railroads filed a complaint requesting the Commission to apply the new formula also to traffic entering Northern territory from points along the Southern/Northern border (known as "borderpoint-north" traffic). Although the hearing examiner entered an order in 1964 granting this request of the southern railroads, this order was not adopted by the Commission until September 19, 1975,[4] due to continuing legal challenges to the general equal-factor basis of divisions between Southern and Northern territories.[5]
 
 
 6
 This September 1975 order, prescribing the borderpoint-north divisions to which Conrail contends it is not bound, was by its terms to become effective one hundred and twenty days after it was issued,[6] and its effectiveness was thereafter postponed by the Commission to February 26, 1976. On February 13, 1976, the Commission denied the petitions for reconsideration, but did agree to delay the effective date of the September 1975 order to May 11, 1976. The northern railroads subsequently requested and received from the Commission another delay in the effective date until June 10, 1976. The northern railroads had also filed petitions in November 1975 for judicial review of the September order in the United States Court of Appeals for the Third Circuit, but withdrew those petitions in June and July of 1976.[7]
 
 
 7
 Conrail, meanwhile, was incorporated on October 25, 1974, as a result of the Regional Rail Reorganization Act of 1973 (RRR Act), 45 U.S.C. § 741, and pursuant to that Act began operations as a common carrier by railroad on April 1, 1976. We note that this commencement of operations was after the equal-factor basis order had been entered (in September 1975) and reconsideration thereof denied (in February 1976) by the Commission. The prospective order was thus final as of the time Conrail commenced rail operations, although there were petitions for review pending in the Third Circuit.
 
 
 8
 As had been contemplated by the RRR Act, Conrail as of April 1, 1976 took over and continued the rail operations of the bankrupt northeastern railroads; and to this end there was conveyed to it on that date substantially all of the rail properties of these railroads.[8] In preparation for this assumption of rail operations, Conrail on February 5, 1976, had filed with the Interstate Commerce Commission the "voluntary adoption" mentioned earlier. That filing stated that
 
 
 9
 Conrail will adopt all existing joint rates, routes and divisions which are presently applicable from, to or via the lines of railroads which are to be conveyed to it pursuant to the Regional Reorganization Act of 1973 . . . except for the rates and routes with the Long Island Railroad.
 
 
 10
 353 I.C.C. at 171.
 
 
 11
 In May of 1976, it was brought to the Commission's attention that because the new borderpoint-north division formula, although prescribed by a final Commission order, had not yet gone into effect on April 1, 1976, it was not within the terms of Conrail's adoption,[9] and therefore Conrail did not intend to comply with it when it became effective on June 10, 1976. On June 8, 1976, the Commission postponed indefinitely the effective date of the formula and issued to Conrail an order requesting it to show cause why it should not be bound by the September 1975 order. After receiving responses from the southern railroads and from Conrail,[10] the Commission on December 9, 1976 held that Conrail was bound as a successor in interest to the bankrupt northeastern railroads against whom the September 1975 order had been entered. When the December 9 order became, at long last, effective on January 7, 1977, Conrail filed this petition for review (as well as a petition for reconsideration by the Commission, which has since been denied). On February 2, 1977, this court denied Conrail's request for a stay of the December 9 order. Thus Conrail, as is true of all other railroads operating within the relevant area, is presently adhering to the equal-factor basis divisions for borderpoint-north traffic as prescribed in the Commission's September 1975 order.
 
 II
 
 12
 In holding that Conrail must comply with the September 1975 divisions order, the Commission undertook a two-step analysis, first concluding from the legislation creating Conrail that it is the successor in interest to the bankrupt railroads, and then holding that as such it is bound by final orders entered against those railroads.[11] The Commission cited three factors supporting its conclusion that Conrail is the successor in interest to the bankrupt railroads.[12] First, the RRR Act designated Conrail
 
 
 13
 as the legal entity to take over the assets and operations of various bankrupt railroads within the framework of existing law. Conrail stands, therefore (,) as a Federally created statutory successor to its predecessor corporations. . . . (Emphasis supplied.)
 
 
 14
 353 I.C.C. at 170. Second, pursuant to the RRR Act Conrail acquired "substantially all of the yards and right of way, and various other assets" of the bankrupt railroads. Id. Third, the Act provided for "a substantial continuity" in stock ownership between the bankrupt railroads and Conrail. Id.
 
 
 15
 We agree with the Commission that these factors demonstrate Congress' intention that Conrail operate subject to prior final Commission orders entered against the bankrupt railroads. We believe that this conclusion flows directly from the legislation creating Conrail, and is not dependent upon the common law doctrine of successor in interest. Both the RRR Act and the Final System Plan adopted pursuant thereto[13] contemplate that on the lines and services it acquired from the bankrupt railroads, Conrail was initially to continue operations as these had been performed by those railroads, subject to all final Commission orders that were binding on those railroads; and that any changes or modifications, whether recommended in the Final System Plan or later developed by Conrail's management, were to be subject to ICC regulation in the same manner in which such changes would have been accomplished had operations been continued by the bankrupt railroads.
 
 
 16
 Several factors compel this conclusion. First, Conrail was not created out of whole cloth: initial assets and operations were conveyed from the bankrupt railroads, and these constituted nearly all of the rail properties[14] and services[15] of those lines. An alternative solution to the rail crisis in the northeast might have been to liquidate the assets of the bankrupt railroads, selling these to other railroads, including, perhaps, a new government owned and operated railroad. Whatever mechanism might have been provided for setting the rates, routes, and divisions for such a railroad is irrelevant because that alternative was not chosen. Instead, the assets and operations of the bankrupt railroads were consolidated under the Railroad Reorganization Act into a single, privately owned,[16] for-profit rail system. As the Supreme Court in the Regional Rail Reorganization Act Cases, 419 U.S. 102, 108-09, 95 S.Ct. 335, 342, 42 L.Ed.2d 320 (1974), stated:
 
 
 17
 Congress concluded that solution of the crisis (precipitated by the bankruptcy of the northeastern railroads) required reorganization of the railroads, stripped of excess facilities, into a single, viable system operated by a private, for-profit corporation.
 
 
 18
 Nor was it intended that once created Conrail would be treated any differently than other railroads. Thus, section 301(b) of the RRR Act states that Conrail "shall be deemed a common carrier by railroad under section 1 (3) of the (Interstate Commerce Act) . . . and shall be subject to the provisions of (the) Act." 45 U.S.C. § 741(b). Notwithstanding that it is by the terms of the RRR Act a new and restructured rail system, there is nothing in the creation or evolution of Conrail suggesting that it is to be immune from regulation which is not financially favorable to it.[17]
 
 
 19
 Most significantly, the objective of unbroken continuity of rail service to the public in the shift of operations from the bankrupt carriers to Conrail pervades the legislation and consolidation process which led to the takeover of operations by Conrail on April 1, 1976. And without the scheme we have described above whereby Conrail is bound by all final orders of the ICC entered against the railroads whose operations it assumed such continuity would have been impossible. Indeed, one of the considerations against liquidation, rather than consolidation, of the bankrupt railroads was that continuity of operations would not be assured under the former.[18]
 
 
 20
 These considerations also demonstrate that it is irrelevant that the particular divisions order at issue in this case was not yet effective on April 1, 1976, the date Conrail assumed the rail operations of the bankrupt railroads. The order was administratively final on February 13, 1976, the date on which the petitions for reconsideration were denied; and the railroads subject to it were required to comply with it as of the date that the Commission specified it would become effective. In its discretion, the Commission provided the railroads with a substantial amount of lead time in which to prepare for the effectiveness of the order, first delaying the effective date until one hundred and twenty days after the order was issued, and then acquiescing in the northern railroads' several requests for additional extensions of the effective date. That the Commission may provide a period of time between the issuance of its orders and their effectiveness does not alter the administrative finality of such orders; nor does it alter the fact that those against whom such orders are entered are bound by them, that is to say, that they are bound to comply with them when they become effective.
 
 
 21
 The clear intent of the RRR Act is that Conrail would be bound by final ICC orders entered against the bankrupt railroads to the same extent those railroads would have been bound had they continued the rail operations transferred to Conrail. The overriding objective of continuity in rail operations and ICC regulation of common carriers by railroad could not be achieved if administratively final orders were not applicable to Conrail simply because the orders were prospective in effect as of the particular date that Conrail commenced operations. The force of this consideration is brought home when it is remembered that the September 1975 borderpoint-north divisions formula at issue in this case was the culmination of a proceeding begun in 1962. Certainly in enacting legislation to solve the rail crisis, Congress did not intend to require relitigation of every route, rate, and division (involving Conrail's lines) which had been the subject of full and final Commission action but happened to be prospective in effect as of the date Conrail came into being. The Interstate Commerce Act, of course, provides a procedure for altering route, rate, and division orders, subject to a full hearing for all concerned parties, and it is this procedure which Conrail must utilize if it desires to overturn the borderpoint-north divisions formula prescribed by the Commission in September of 1975.
 
 
 22
 The combination of the desire for continuity in operations and the provision that Conrail be subject to ICC regulation can lead to only one realistic inference, namely, that Conrail would be bound by all rates, divisions and other orders, prospective and otherwise, prescribed by final action of the ICC which were applicable to the rail lines to be operated by Conrail, and that Conrail would thereafter be subject to ICC regulation in respect of the modifying of these orders.
 
 
 23
 The Final System Plan under which Conrail operates confirms this inference. The United States Railway Association, created by Congress expressly for this purpose, was given the task of designating which routes and facilities of the bankrupt railroads should be conveyed to Conrail. As identified and explained in the Final System Plan, these designations were based in part on estimates as to the future profitability of each rail segment. These estimates in turn were obtained by assuming currently applicable rates and charges prescribed by the ICC for the bankrupt railroads, allowing only for general rate increases the ICC has allowed in order to compensate for inflation. USRA did recommend certain rate adjustments, but the Plan specifically notes that the granting of such increases is subject to the control of the Interstate Commerce Commission. See Final System Plan, Vol. I, at 77.[19]
 
 
 24
 Not only Congress and USRA but also Conrail itself has recognized that it was to operate subject to the regulatory orders to which the bankrupt railroads would have been subject if they had continued rail operations, and that it must abide by the framework contained in the Interstate Commerce Act for changing these orders. In its so-called "voluntary adoption" of presently applicable joint rates, routes, and divisions, Conrail specifically refused to adopt the tariff provisions pertaining to rates for certain TOFC (trailer-on-flat-car) service. Under the theory advanced on this appeal, Conrail could have simply cancelled unilaterally those TOFC operations. Instead, the ICC, on the day before Conrail commenced operations, suspended the proposed cancellations and ordered an investigation pursuant to § 15(8) of the Interstate Commerce Act. In its order ultimately granting some of these proposed cancellations, the ICC noted:
 
 
 25
 Although it previously had contended that this Commission lacked statutory jurisdiction to suspend or adjudicate the proposed changes in TOFC services, . . . Conrail on brief specifically concedes that jurisdiction and it recognizes that the provisions of the Interstate Commerce Act govern the proposals in issue.
 
 
 26
 Cancellation of TOFC Service, 355 I.C.C. 26, 28 (1976), Pet. for review pending (D.C. Cir. No. 77-1147).
 
 
 27
 Conrail would now have this court conclude that it was free upon commencing operations to file tariffs with the ICC setting any rates and divisions it may have desired. Presumably, under Conrail's theory, the Commission would not have had power to suspend these under § 15(6) and § 15(8) of the Interstate Commerce Act, but would have been required to allow these changes to remain in effect until it completed hearings on their lawfulness. We conclude, on the contrary, that there is nothing in the legislative history or the express provisions of the Act creating Conrail, in the Final System Plan promulgated pursuant thereto, or in the fundamental nature of the resulting reconstructed rail system, to support such a view. Rather, each of these factors demonstrates that Conrail must be bound by all orders, including the prospective order at issue in this case, entered against the bankrupt northeastern railroads whose operations Conrail has assumed.
 
 III
 
 28
 Conrail argues that requiring it to commence operations subject to the regulatory scheme already in effect, absent its consent thereto, is inconsistent with provisions of the Interstate Commerce Act that provide a hearing on the justness of rates and divisions prescribed by the ICC. It is not clear whether this argument is intended to suggest failure of the Commission to comply with its statutory mandate, or lack of due process, or, more broadly, that considerations of equity require that Conrail not be bound by prior Commission orders. None of these contentions is meritorious.
 
 
 29
 We respond first by noting that the ICC fully performed its duties under § 15(6); the full panoply of administrative notice and hearing was provided prior to imposition of the equal-factor basis divisions for borderpoint-north traffic. We note additionally that there can be no allegation that Conrail's position with respect to this order was not fully presented in this process. The interests of Conrail, as the owner and operator of the Northern territory lines affected, are identical to those of the bankrupt northeastern railroads that participated in every stage of this long and oft-delayed administrative process.
 
 
 30
 It is true that there was no judicial review of the September 1975 order applying equal-factor basis divisions to borderpoint-north traffic. Although the northern railroads, including certain bankrupt railroads which were soon to be taken over by Conrail, did initially file petitions for review in the Third Circuit, these petitions were withdrawn in June and July of 1976, several months after Conrail commenced operations. However, Conrail was on formal notice of the Commission's intention to hold it bound by the order prescribing the equal-factor divisions at least as of June 8, 1976, the date of the Commission's show-cause order directed to it. At any time before or after this date, Conrail would have been entitled to intervene in the judicial review proceedings in the Third Circuit if it questioned the validity of the equal-factor basis divisions order. For our conclusion that Conrail was bound by the ICC orders having administrative finality that were applicable to the rail lines to be operated by Conrail (See p. 943, Supra ) carries a corollary right in Conrail to a judicial challenge of the validity of those orders, assuming that time for judicial contest had not expired. The petitions to review filed by the bankrupt roads had kept alive the opportunity for judicial challenge of the divisions order.[20] Conrail chose not to intervene, deciding instead to contest the Commission's determination to hold it bound by that order, which determination this court now upholds.
 
 
 31
 Congress certainly had the authority to require the restructured rail system of its creation to begin operations under the regulatory structure already in place. Conrail is wholly a creature of the legislation creating it, and it cannot now complain of what it perceives to be an unfavorable aspect of its essential purpose and mandate to acquire the assets and assume the operations of the bankrupt northeastern railroads, subject to ICC regulation as is every other railroad in interstate commerce.
 
 
 32
 Affirmed.
 
 
 
 [1]
 The Cincinnati, New Orleans & Texas Pacific R. C. v. Akron, Canton & Youngstown R. R. Co., 351 I.C.C. 769 (1975)
 
 
 [2]
 49 U.S.C. § 15(6), as amended by the Railroad Revitalization and Regulatory Reform Act of 1976, P.L. 94-210, to add requirements for expeditious handling of cases, provides in pertinent part:
 (6)(a) Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the Commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order or investigation) would have been the just, reasonable, and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith.
 . . . .son
 
 
 [3]
 Official-Southern Divisions, 287 I.C.C. 497, 289 I.C.C. 4 (1953). It was apparently because of a procedural defect that this order did not apply to borderpoint-north traffic, See 298 I.C.C. 83, 84 (1956)
 
 
 [4]
 The northern railroads, including the Pennsylvania and New York Central railroads (later merged to become the Penn Central Transportation Co.), were parties to these proceedings
 
 
 [5]
 See generally Aberdeen & Rockfish R. Co. v. United States, 270 F.Supp. 695 (E.D.La.1967), Aff'd sub nom. Baltimore & Ohio R. Co. v. Aberdeen & Rockfish R. Co., 393 U.S. 87, 89 S.Ct. 280, 21 L.Ed.2d 219 (1968)
 
 
 [6]
 "Effective date" as used in this opinion refers to the date on which the division formula prescribed in the September 1975 order would become the formula actually used for determining a railroad's share of joint rates, that is to say, the date by which the railroads were required to comply with the September 1975 order
 
 
 [7]
 Penn Central Transportation Co. and other bankrupt north-eastern railroads moved to be dismissed on May 29, 1976; the Third Circuit granted these motions on June 25, 1976. The remaining petitioners agreed to a voluntary dismissal on July 27, 1976
 
 
 [8]
 Certain rail properties of the following six railroads were conveyed to Conrail: Penn Central Transportation Co., Reading Co., Erie Lackawanna R. Co., Central R. Co. of New Jersey, Lehigh Valley R. Co., and Lehigh and Hudson River R. Co
 
 
 [9]
 The Commission in its order holding Conrail bound by the September 1975 order did not contest Conrail's interpretation of this adoption to apply only to routes, rates, and divisions which were in actual effect and being used on April 1, 1976. In disposing of this petition for review, we likewise will accept Conrail's construction of this adoption
 
 
 [10]
 The northern railroads, including the bankrupt railroads whose operations Conrail had assumed, did not take a position on whether Conrail should be bound. 353 I.C.C. at 169
 
 
 [11]
 The Commission correctly noted that there is clear precedent for holding that a railroad is bound by prior ICC orders entered against its predecessor in interest. See Interstate Commerce Commission v. Western New York & Pac. R., 82 Fed. 192 (C.C.W.D.Pa.1897) (successor railroad was survivor of a merger); Behlmer v. Louisville & Nashville R. Co., 83 Fed. 898 (4th Cir. 1897), Rev'd on other grounds, 175 U.S. 698, 20 S.Ct. 209, 44 L.Ed. 309 (1900) (predecessor railroad was in receivership at time of ICC order)
 
 
 [12]
 The Commission also concluded that Conrail's "voluntary adoption" of existing rates, routes, and divisions was inconsistent with its contention that it is not bound by the September 1975 divisions order. Id. at 171
 
 
 [13]
 The Final System Plan was published in July of 1975 by the United States Railway Association (USRA), which had been created by Congress in order to determine the exact facilities and operations of the bankrupt railroads that would be conveyed to Conrail and to determine the appropriate method of conveyance. Under the terms of the RRR Act, See § 208(a), 45 U.S.C. § 718(a), Congress adopted the designations of the Final System Plan when it failed to object thereto
 
 
 [14]
 Conrail does not seriously contest the Commission's finding, See 353 I.C.C. at 168-69, that it has received substantially all of the rail assets of the bankrupt northeast railroads. It has been estimated that $534 million of the $685 million of property transferred under the Final System Plan was conveyed to Conrail. See USRA, Third Annual Report at 2 (June 30, 1976)
 
 
 [15]
 According to the Final System Plan, 97.8% Of the traffic carried by the bankrupt railroads would continue to be carried by Conrail. Final System Plan, Vol. II, at 2 (1975)
 
 
 [16]
 See RRR Act § 303(a), 45 U.S.C. § 743(a)
 
 
 [17]
 This is to be contrasted with provisions in the RRR Act for Conrail to take the property of the bankrupt railroads "free and clear of any liens and encumbrances," § 303(b)(2), 45 U.S.C. § 743(b)(2)
 During Senate consideration of the Railroad Revitalization and Regulatory Reform Act of 1976, Senator Hartke introduced an amendment which would have provided that Conrail
 shall be deemed to have adopted and offered, without any further action on its part, all portions of the tariffs, schedules, and Division agreements of its predecessors in interest effect upon the date of such transfer . . . until they are changed pursuant to appropriate provisions of the Interstate Commerce Act, or in the case of Division agreements, by agreement of the parties. (Emphasis supplied.)
 Conrail suggests on brief that the Senate's failure to accept this amendment indicates its intention that Conrail not be bound by the division order at issue in this case. We refuse to make such a broad inference from failure to adopt an amendment that is not even applicable to the dispute before us, which involves a division Order imposed by the ICC in the absence of carrier agreement thereon.
 
 
 [18]
 See H.R.No.93-620, 93rd Cong., 1st Sess., Comm. on Interstate and Foreign Commerce, 28-29
 
 
 [19]
 See also Final System Plan, Vol. I, at 170-71 (proposal that "Conrail's management Recommend to the industry and the ICC implementation of a series of minimum charges per car"). (Emphasis supplied.)
 
 
 [20]
 We need not now consider whether Conrail could have included in its intervention grounds of challenge not raised by the bankrupt roads. Such a question may be purely academic